IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KAREN HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 14 C 9106 |
| v. | ) | |
| | ) | Judge John Z. Lee |
| | ) | |
| CHICAGO TRANSIT AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Karen Harris ("Harris") has brought this action against the Chicago Transit Authority ("CTA"), raising various claims stemming from her employment as a CTA bus driver. The Court granted the CTA's motion to dismiss in part, and what remains are Harris's claims of retaliation based on complaints of gender harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), interference with leave under the Family and Medical Leave Act, 29 U.S.C. § 2611, *et seq.* ("FMLA"), and defamation *per se* under Illinois law. The CTA moves for summary judgment as to these claims, and further moves to strike [96] Harris's submissions in response to summary judgment [89, 90, and 95]. For the reasons that follow, the motion to strike [96] is granted, and the motion for summary judgment [72] is granted in part and denied in part.

## Northern District of Illinois Local Rule 56.1

Northern District of Illinois Local Rule ("LR") 56.1 establishes a procedure for presenting facts on summary judgment. Under LR 56.1(a)(3), the movant must submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." In turn, the opposing party must file "a concise response to

1

the movant's statement." LR 56.1(b)(3). This response must consist of "numbered paragraphs, each corresponding to and stating a concise summary of the paragraph to which it is directed." LR 56.1(b)(3)(A). In addition, the opponent must "respon[d] to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." LR 56.1(b)(3)(B).

Here, because Harris is proceeding *pro se*, the CTA served her with a "Notice to Pro Se Litigant Opposing Motion for Summary Judgment," which is required under LR 56.2. *See* LR 56.2 Notice, ECF No. 79. The statement explained LR 56.1 and cautioned Harris that if she did not comply with the rule, "the judge will be forced to assume that you do not dispute the facts which you have not responded to." *Id.* at 2. Furthermore, at a status hearing on December 8, 2016, the Court specifically directed Harris to LR 56.1 and explained the consequences of failing to comply with the rule.

At the December 8 status hearing, the Court also discussed a briefing schedule with the parties. The Court asked Harris how much time she would like to have for a response. Harris asked for twenty-one days, or to file a response by December 29, 2016. In light of Harris's *pro se* status, the Court offered to permit her until January 31, 2017, to file her response. Harris rejected the Court's offer and insisted on December 29 as the deadline for her response to be due. The Court therefore set December 29 as the deadline for her response brief, with the CTA's reply due by January 19, 2017. On December 29, Harris filed a "Notice of Filing" in which she indicated that she "[would] be [filing] for a motion for exten[s]ion." ECF No. 83. No motion ever followed. The CTA timely filed its reply on January 19, 2017.

Then, approximately one month later, on February 17, 2017, without communicating with the Court or seeking an extension, Harris filed two documents. Both list LR 56.1 in their titles, but

neither complies with the rule. Specifically, while the documents contain numbered paragraphs, they do not correspond to the paragraphs in the CTA's LR 56.1(a)(3) statement. They do not delineate a summary of the paragraph to which they are responding, nor do they indicate whether there is disagreement and the portion of the record upon which disagreement is based. The same is true of Harris's 238-page "Plaintiff's Material Facts Opposing Defendants Summary Judgement," which was filed August 15, 2017, seven months after her response was due.

While the Court is mindful of its duty to construe *pro se* filings liberally, *pro se* litigants are not excused from complying with procedural rules. *Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008). Based on Harris's failure to file her summary judgment response in a timely manner without seeking any extension from the Court, and in light of the fact that her response does not comply with LR 56.1, as well as the prior admonishments that have been provided to her regarding this obligation, the Court will disregard the response in its entirety. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 605–08 (7th Cir. 2006) (affirming a district court's decision to disregard a late-filed summary judgment response); *see, e.g.*, *Brown v. Wyndemere LLC*, 608 F. App'x 424, 425 (7th Cir. 2015) (affirming a district court's decision to strike a *pro se* plaintiff's filing for failure to comply with LR 56.1). Accordingly, the CTA's motion to strike is granted. The Court will therefore accept the CTA's "uncontroverted version of the facts to the extent that it is supported by evidence in the record." *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012).

That said, insofar as the materials the CTA has submitted indicate that summary judgment is not warranted, the Court does not deem Harris's failure to file a timely, rule-compliant response dispositive. *See Perez v. Thorntons, Inc.*, 731 F.3d 699, 706 (7th Cir. 2013) ("Where the moving party has undermined its own [LR] 56.1 assertion through the presentation of contradictory

3

assertions and evidence, a nonmovant's 'admission' of the movant's assertion is not decisive."). Additionally, the Court will construe the record liberally in light of Harris's *pro se* status to the extent the CTA has presented material to which Harris could testify herself or which is otherwise admissible. *See Sistrunk v. Khan*, 931 F. Supp. 2d 849, 854 (N.D. Ill. 2013). With this framework in mind, the Court turns to the relevant background.

## **Factual and Procedural Background**

Harris drove busses for the CTA from 2008 until her termination in 2014. Def.'s LR 56.1(a)(3) Stmt. ¶ 4, ECF No. 74. During her term of employment, a number of events occurred giving rise to her suit before this Court. First, on July 4, 2011, Harris phoned in to work to take leave under the FMLA. *See id.* ¶ 21. According to Harris, she had been authorized to take such leave due to recurring high blood pressure. *See id.*, Ex. 1 (hereafter "Pl.'s Dep."), at 47:7–18, 83:2–5. Lisa Johnson, a CTA manager, denied her request. *Id.* at 47:1–48:9; *see* Def.'s LR 56.1(a)(3) Stmt., Ex. 11. At her union's instruction, Harris then went into work and attempted to invoke FMLA leave in person. Pl.'s Dep. at 47:24–48:9. Johnson again denied her request. *Id.* An altercation ensued in which Harris claims that Johnson acted rudely and belligerently toward her. *Id.* In response to Johnson's actions, Harris filed a "Report to Manager" complaining of Johnson's behavior (hereafter, "the Johnson Report"). Def.'s LR 56.1(a)(3) Stmt., Ex. 11. The report details Harris's multiple attempts to take FMLA leave on July 4, describes Johnson's behavior, and states that Harris had to go to the emergency room following the altercation. *Id.*

Harris further claims that she was wrongfully denied leave under the FMLA on other occasions. On September 20, 2013, Harris attempted to take FMLA leave, but instead of entering her leave as such, Ronnie Brown, another CTA manager, charged her with a "sick entry." Pl.'s Dep. at 76:23–77:3, 77:23–78:3, 80:16–20. In the course of discussing the issue with Harris, Brown

4

allegedly said to her, "Baby, I mean, Ms. Harris, you have a lot of fans around here." *Id.* at 82:1–4. Evidently, Harris believes that Brown made the statement based on a conversation he had with his manager, Derrick McFarland, who was also Lisa Johnson's manager in 2011. *Id.* at 82:5–8, 102:3–18, 104:22–105:17. Harris suspects that McFarland was motivated to retaliate against her based on the report she filed against Johnson on July 4, 2011. *Id.* at 102:7–18.

Harris was again denied FMLA leave beginning on November 11, 2013. Def.'s LR 56.1(a)(3) Stmt. ¶ 55. She had been approved for intermittent FMLA leave from February 28, 2013, through February 27, 2014. *Id.* ¶ 53. But, leading up to November 11, 2013, Harris "exceeded the approved frequency and/or duration stipulated by her medical provider." *Id.* ¶ 54. Sedgwick CMS ("Sedgwick"), the CTA's third-party FMLA administrator, requested that Harris submit a recertification from her medical provider establishing that she was entitled to leave. *Id.* ¶ 55. Harris, however, failed to submit a recertification by the deadline requested by Sedgwick. *Id.* ¶ 57. Her remaining FMLA leave through February 27, 2014, was therefore cancelled, until Harris submitted a recertification on December 13, 2013. *Id.* ¶¶ 57–58. Sedgwick reinstated her FMLA leave from that date forward through February 27, 2014. *Id.* ¶ 59.

For certain periods in February through April 2014, Harris again sought FMLA leave, but Sedgwick denied her requests due to her failure to provide a certification indicating her need for leave during that time frame. *Id.* ¶ 60. Harris was approved for intermittent FMLA leave in May 2014, but her request for leave in July 2014 was denied, again due to her failure to provide a certification. *Id.* ¶¶ 61–62.

In addition to the incidents in which Harris requested, but was denied, leave under the FMLA, Harris's claims arise in part from an event that occurred on December 5, 2013. On that day, Plaintiff collapsed during (or at the conclusion of) a disciplinary hearing. *Id.* ¶ 41. She was taken

5

to an emergency room, where she was diagnosed with fainting, but otherwise given a clean bill of health. *Id.*, Exs. 17, 19. She was then examined by Dr. Maqsood H. Jafri, the CTA's occupational health doctor. *Id.*, Ex. 18. Dr. Jafri noticed an irregularity with her left eye, which Harris claimed was normal and had existed from birth. *Id.*, Ex. 19. Dr. Jafri nevertheless called the emergency room physician to ask why he had not noted the irregularity. *Id.* The emergency room physician "insisted to him that it was normal." *Id.* Evidently unpersuaded, and concerned that Harris should not be given permission to return to work if unable to perform her duties as a bus operator, Dr. Jafri then called another physician in order to refer Harris for further examination. *See id.* During this conversation, Harris claims that Dr. Jafri told the other physician that Harris had a glass eye, may have suffered a stroke or head injury, and "did not need to be driving for [the] CTA." *Id.*; *see* Pl.'s Dep. at 142:18–143:4.

Plaintiff was ultimately terminated by the CTA after committing a number of violations of CTA rules and policies. Under the CTA's progressive discipline system, employees are given a one-day suspension for their first behavioral violation within a twelve-month period, a three-day suspension for their second violation, and are recommended for termination after a third violation. Def.'s LR 56.1(a)(3) Stmt. ¶ 10. Plaintiff committed three such violations and progressed fully through the system. First, on June 19, 2014, she received a one-day suspension for a behavioral violation she incurred during a confrontation with a supervisor. *Id.* ¶ 11. Then, on September 18, 2014, she was suspended for three days based on two different incidents in which she refused instructions to drive her bus out of the lot in an appropriate and timely manner. *Id.* ¶¶ 12–14. Finally, on October 8, 2014, she was recommended for termination based on an incident in which she was insubordinate and refused to follow an order from a supervisor. *Id.* ¶ 16. She was thereafter terminated. *Id.* ¶ 17.

Plaintiff filed her action in this Court on November 11, 2014, raising various claims against the CTA. On September 10, 2015, the Court granted in part and denied in part the CTA's motion to dismiss. *See generally Harris v. Chi. Transit Auth.*, No. 14 C 9106, 2015 WL 5307721 (N.D. Ill. Sept. 10, 2015). The Court permitted Harris to proceed on claims of Title VII retaliation based on complaints of gender harassment, interference with FMLA leave, and defamation based on Dr. Jafri's statements. The CTA has now moved for summary judgment on Harris's claims.

## Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012). In reviewing a motion for summary judgment, the Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013). The Court must not make credibility determinations or weigh conflicting evidence. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010).

## Analysis

### I. Title VII Retaliation

The CTA first moves for summary judgment on Harris's Title VII retaliation claim. In *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), the Seventh Circuit refined the approach that district courts should take in evaluating Title VII claims. Eschewing "the rat's nest of surplus

tests" to evaluate Title VII claims (including direct versus indirect methods of proof), *id.* at 765–66, the court refocused the inquiry on "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* at 765. Under this inquiry, "[e]vidence must be considered as a whole," regardless of whether it is "direct" or "indirect" in nature (and without reference to those terms). *Id.*

Still, the burden-shifting framework under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973),[1] remains a valid—but nonexclusive—method of proving a Title VII claim. *Ortiz*, 834 F.3d at 766. Moreover, the Seventh Circuit has held that the clarification announced in *Ortiz* applies both to disparate treatment and retaliation claims under Title VII. *Williams v. Office of Chief Judge of Cook Cty.*, 839 F.3d 617, 626 (7th Cir. 2016) (citing *Ortiz*, 834 F.3d at 764–65).

Thus, in evaluating whether Harris's Title VII retaliation claim survives summary judgment, the Court will consider the evidence she presents in her favor as a whole. In doing so, the Court will consider whether she has made out a *prima facie* case under the traditional *McDonnell Douglas* framework. Ultimately, however, the Court will focus on the more general inquiry of whether a reasonable jury could find that the CTA terminated because of her complaints about gender harassment. *See Pearson v. Ill. Bell Tel. Co.*, No. 15 C 653, 2016 WL 7374235, at *6 (N.D. Ill. Dec. 20, 2016) (adopting a similar approach in the wake of *Ortiz*).

---

[1] Under this framework, a Title VII plaintiff makes out a *prima facie* case of retaliation by showing she: (1) "engaged in protected activity"; (2) "suffered a materially adverse employment action"; (3) "was meeting [her] employer's legitimate expectations"; and (4) "was treated less favorably than similarly-situated employees who did not engage in protected activity." *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016). "Once a *prima facie* case is established, a presumption of retaliation is triggered, and the burden shifts to the employer to articulate some legitimate, nonretaliatory reason for its action." *Id.* "When the employer does so, the burden shifts back to the plaintiff, who must present evidence that the stated reason is a pretext, which in turn permits an inference of unlawful retaliation." *Id.*

8

### A. Protected Activity

The CTA first points out that the record is devoid of any indication that Harris made any complaints about gender harassment. The CTA therefore maintains that, absent any such complaints, Harris did not engage in protected activity that can serve as the basis of her retaliation claim. "Complaining to an employer about impermissible discrimination and filing a charge of discrimination with the EEOC are statutorily protected activities." *Eskridge v. Chi. Bd. of Educ.*, 47 F. Supp. 3d 781, 794 (N.D. Ill. 2014) (citing *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)). That said, "[m]erely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich*, 457 F.3d at 663.

Harris never complained to anyone at the CTA about harassment based on her gender. Def.'s LR 56.1(a)(3) Stmt. ¶ 19. In addition, none of the union grievances she filed between 2011 and 2014 mentioned harassment based on sex or gender. *Id.* ¶ 20. Rather, Harris testified at her deposition that her retaliation claim arises solely from the July 4, 2011, report regarding the altercation she had with Johnson when she attempted to take FMLA leave that day. Pl.'s Dep. at 74:1–13. The report itself contains no mention of gender harassment. Def.'s LR 56.1(a)(3) Stmt. ¶¶ 22–23; *id.*, Ex. 11. Because none of these actions involves a complaint of gender harassment, none can give rise to a Title VII retaliation claim premised on complaints about gender harassment.

Nor can a November 22, 2013, charge of discrimination that Harris filed before the EEOC. The charge checks a box for retaliation, but leaves the box for sex unchecked. *Id.*, Ex. 12. The narrative portion of the charge states as follows: "During my employment[,] I have been subjected to harassment. I complained about the harassment to no avail, and was subsequently subjected to disciplines and suspensions." *Id.* The charge makes no mention of gender harassment. Indeed,

9

during her deposition, Harris confirmed that she did not file the charge in order to make a retaliation claim based on complaints of gender harassment, and explained that she was instead referring to harassment she experienced based on her filing the Johnson report, in which she complained of Johnson's conduct when she attempted to take leave on July 4, 2011. Pl.'s Dep. at 53:3–16, 70:5–17. Because the Johnson report did not involve allegations of gender harassment, the November 22, 2013 charge of discrimination was not protected activity on which Harris can ground her Title VII retaliation claim.

In its order denying the CTA's motion to dismiss, the Court stated that, "[c]onstruing all allegations and inferences in Harris'[s] favor, it appears that [Harris's] grievances were based upon the September 20, 2013, incident where Harris was allegedly called 'baby' by her manager." *Harris v. Chi. Transit Auth.*, No. 14 C 9106, 2015 WL 5307721, at *5 (N.D. Ill. Sept. 10, 2015). Nothing produced in discovery, however, substantiated this inference. And, as explained in the preceding paragraphs, the record before the Court and Harris's own statements belie any notion that her grievances were based on gender harassment. Moreover, at her deposition, Harris suggested that Ronnie Brown, the manager that called her baby, did so because he was instructed to retaliate against her by Derrick McFarland, another manager, who wished to retaliate against Harris for filing Johnson report. *See* Pl.'s Dep. 82:1–6, 102:1–18, 104:22–105:17. Thus, Harris did not view the "baby" comment as an instance of gender harassment, and did not complain about the comment through a grievance or otherwise.

For these reasons, no reasonable jury could conclude that Harris engaged in protected activity that could give rise to her retaliation claim.

B.   **Legitimate Expectations**

The CTA further argues that Harris cannot show that she was meeting the CTA's legitimate expectations at the time she was fired. This requires the Court to look at Harris's performance through the eyes of her supervisors at the CTA at the time of her suspensions and termination. *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008). As explained in more detail above, it is undisputed that Harris's termination was preceded by three different instances of documented misconduct in which she violated CTA rules and policies. Def.'s LR 56.1(a)(3) Stmt. ¶¶ 11–17. By way of this conduct, Harris progressed through all three steps of the CTA's disciplinary process, and was terminated accordingly. *Id.* Thus, Harris cannot demonstrate that she was meeting the CTA's legitimate expectations at the time of her termination. *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012) (concluding that a Title VII plaintiff who "d[id] not proffer any evidence to rebut [the employer's] criticism of his job performance" could not demonstrate he was meeting his employer's legitimate expectations at the time of his termination).

C.   **Similarly Situated Employees**

In addition, the CTA points out that Harris has identified no similarly situated employees who did not engage in protected activity and were treated more favorably than Harris. To demonstrate that similarly situated employees did not experience retaliation, a Title VII plaintiff must demonstrate that "[a] similarly situated employee [is] 'directly comparable' to plaintiff[] 'in all material respects.'" *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 981 (7th Cir. 2014) (quoting *Abuelyaman v. Ill. State Univ.*, 667 F.3d 800, 810 (7th Cir. 2011)). This is a common-sense, flexible inquiry under which courts consider a number of factors, "including whether the similarly situated employee held the same position, had the same supervisor, was subject to the same standards, and engaged in similar conduct." *Id.* Here, however, Harris has identified no

comparators, let alone established that they were similarly situated to her. Thus, she cannot satisfy this element of the *McDonnell-Douglas* framework. *Carothers v. Cty. of Cook*, 808 F.3d 1140, 1152 (7th Cir. 2015) (holding that a Title VII plaintiff that had not identified any similarly situated co-workers waived analysis of her claim under the *McDonnell Douglas* framework).

### D. Pretext

Next, the CTA contends that, assuming *arguendo* that Harris could establish a *prima facie* case of retaliation under the *McDonnell Douglas* framework, she cannot show that the CTA's stated reason for terminating her—*i.e.*, the disciplinary violations leading up to her termination—were pretextual. Under the *McDonnell Douglas* framework, a plaintiff must demonstrate that an employer's legitimate, stated reasons for taking an adverse employment are pretextual. *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 894 (7th Cir. 2016). To demonstrate pretext, Harris must point to evidence from which a reasonable jury could conclude that the CTA's stated reasons for terminating her were "phony" or a "lie." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). Here, however, there is nothing in the record to suggest that Harris was terminated for complaining of gender harassment and not for the reasons the CTA stated in terminating her. In fact, she specifically denied at her deposition that she was terminated for complaining of gender harassment. Pl.'s Dep. at 53:3–16, 70:5–17, 74:1–13. Thus, no reasonable jury could conclude that the CTA's stated reasons for terminating Harris were pretextual. *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 465 (7th Cir. 2016) (declining, "[i]n the absence of evidence of pretext or bad faith," to question an employer's stated reasons for terminating an employee).

### E. Evaluating the Evidence as a Whole Under *Ortiz*

For the reasons stated in the preceding paragraphs, Harris cannot make out a case of Title VII retaliation under the *McDonnell Douglas* framework. And, viewing the record as a whole, the

Court concludes that no reasonable jury could find she was terminated based on complaints of gender harassment. In her deposition, Harris unequivocally and repeatedly denied that her retaliation claims were based on complaining about gender harassment. Pl.'s Dep. at 53:3–16, 70:5–17, 74:1–13. Rather, the retaliation of which she complains stems entirely from the Johnson Report, which did not even mention gender harassment. *Id.* at 74:1–13; Def.'s LR 56.1(a)(3) Stmt., Ex. 11. Moreover, there is no evidence in the record from which a reasonable jury could conclude that Harris was terminated because of complaining of gender harassment, and not for the disciplinary violations on which the CTA relied in terminating her.

For the foregoing reasons, the CTA's motion for summary judgment on Harris's Title VII retaliation claim is granted.

## II. FMLA Interference

The CTA next moves for summary judgment on Harris's FMLA interference claim. To prove her claim of FMLA interference, Harris must show that (1) she was eligible for the FMLA's protections, (2) the CTA was covered by the FMLA, (3) she was entitled to leave under the FMLA, (4) she provided sufficient notice of her intent to take leave, and (5) the CTA denied her FMLA benefits to which she was entitled. *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006). The CTA argues that Harris was not entitled to leave under the FMLA during the periods on which she bases her suit.

As pertinent here, "[w]hen an employee initially requests FMLA leave, the employer may take the employee at his word and grant the request, or 'may request certification by the employee's healthcare provider.'" *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 837 (7th Cir. 2014) (quoting *Kauffman v. Fed. Exp. Corp.*, 426 F.3d 880, 886 (7th Cir. 2005)); *see* 29 U.S.C. § 2613(a). The certification must, among other things, provide the date on which the serious health condition

giving rise to the leave request commenced, the condition's "probable duration," "appropriate medical facts within the knowledge of the health care provider regarding the condition," and, where an employee claims leave on the basis that he or she is unable to perform work duties, a statement of such, an explanation of why leave is necessary, and the planned treatment and duration of leave. 29 U.S.C. § 2613(b); *Hansen*, 763 F.3d at 837.

Furthermore, FMLA regulations provide that an employer must advise an employee whenever it finds a certification is incomplete or insufficient, state what would be necessary to make the certification complete and sufficient, and provide the employee with an opportunity to cure the deficiency. 29 C.F.R. §§ 825.305(c)–(d); *Hansen*, 763 F.3d at 837. Moreover, FMLA regulations permit an employer to request recertification at minimum every thirty days, and more frequently where "[c]ircumstances described by the previous certification have changed significantly," which can include "the duration or frequency of the absence." 29 C.F.R. § 825.308(c)(2); *Hansen*, 763 F.3d at 837–38. When an employer requests recertification, "[t]he employee has the same obligations to participate and cooperate (including providing a complete and sufficient certification or adequate authorization to the health care provider) in the recertification process as in the initial certification process." 29 C.F.R. § 825.308(e).

Here, the CTA focuses on FMLA leave that Harris requested, but was denied, beginning on November 11, 2013. As noted above, Harris requested FMLA leave at various points beginning on November 11, 2013, but her requests were denied due to her failure to submit requested certifications or recertifications. In her deposition, Harris does not appear to dispute that she received these requests. CTA, by way of Sedgwick, was entitled to request these certifications and recertifications, particularly given that Harris had exceeded the frequency and duration of absences outlined by her physician during her leave that commenced on February 28, 2013. In issuing

14

requests for certifications and recertifications, the CTA, again by way of Sedgwick, adhered to the procedure described above. Thus, for the period beginning on November 11, 2013, there is no genuine dispute of material fact as to whether the CTA interfered with Harris's use of leave under the FMLA. Accordingly, the CTA is entitled to summary judgment on Harris's FMLA interference claim stemming from this period.

The CTA, however, fails to address other dates on which Harris claims that she was wrongfully denied leave under the FMLA. During her deposition, the CTA confirmed with Harris that there were "two periods" during which she claims she was wrongfully denied leave. Pl.'s Dep. at 74:20–23. As noted above, the first period began (and evidently ended) on July 4, 2011. *Id.* at 74:24–75:3, 75:17–19, 76:14–16. Despite confirming with Harris at her deposition that she believes she was wrongfully denied FMLA leave on July 4, 2011, and despite attaching as an exhibit to its summary judgment motion the complaint that Harris submitted in relation to the July 4 incident, which describes her failed attempt to take leave under the FMLA, the CTA offers no argument in relation to this date. Similarly, the CTA confirmed with Harris at her deposition—immediately after confirming that the first period of interference began on July 4, 2011—that the second period began on September 20, 2013. *Id.* at 76:21–77:1, 77:23–78:3. The CTA's motion, however, fails to account for the period between September 20, 2013, and November 11, 2013.

The Court is mindful of the fact that Harris's *pro se* complaint does not specify when she believes her FMLA leave was wrongfully denied, and notes that Harris's answers during her deposition were at times evasive and combative. But, in describing the periods at her deposition in which she claims her right to leave under the FMLA was interfered with, Harris was quite clear, and it is the CTA's burden at this stage to show that no reasonable jury could find in her favor.[2]

---

[2] In addition to Harris's deposition, the CTA specifically notes the July 4 incident in its LR 56.1 statement. Def.'s LR 56.1(a)(3) Stmt. ¶ 21, and Harris references September 30, 2013, in the initial pages of

15

Accordingly, the CTA has failed to meet its burden of showing that there is no genuine dispute of material fact as to whether it wrongfully denied Harris leave under the FMLA on July 4, 2011, and between September 20, 2013, and November 11, 2013. Accordingly, the CTA's motion for summary judgment is denied with respect to these dates.

For the foregoing reasons, the CTA's motion for summary judgment on Harris's FMLA interference claim is granted in part and denied in part.

### III. Defamation *Per Se*

In regard to Harris's defamation *per se* claim, the CTA first argues that it is entitled to summary judgment because Dr. Jafri's statements—that Harris had a glass eye, may have suffered a head injury or stroke, and that she should not be driving for the CTA—are inadmissible hearsay. The CTA maintains that it never specifically authorized Dr. Jafri's statements and that the statements did not concern a matter within the scope of Dr. Jafri's employment so as to satisfy the exceptions to the hearsay rule enumerated in Federal Rules of Evidence ("FRE") 801(d)(2)(C) and 801(d)(2)(D). While the CTA is correct that the record provides no indication that the CTA specifically authorized the statements, the Court is nevertheless persuaded that the statements concern a matter within the scope of Dr. Jafri's role as the CTA's occupational health doctor. All that FRE 801(d)(2)(D) requires is that "the statement be made by an individual who is an agent, that the statement be made during the period of the agency, and that the matter be within the subject matter of the agency." *Young v. James Green Mgmt., Inc.*, 327 F.3d 616, 622 (7th Cir. 2003). Here, the CTA does not dispute that Dr. Jafri was its agent, or that his statement was made during the period of his agency. Def.'s Mem Supp. Summ. J. at 13 n.2, ECF No. 73. Moreover, in serving as the CTA's occupational health doctor, he made the statements at issue about Harris, a CTA

---

her complaint, Compl. at 2–3, ECF No. 7. The CTA cannot claim that it was not on notice that Harris's FMLA interference claim related in part to these time periods.

employee whom he had examined, in requesting that another doctor examine her again. Thus, the foundational requirements of FRE 801(d)(2)(D) are satisfied, and Dr. Jafri's statements are admissible for their truth.

Next, the CTA contends that Dr. Jafri's description of Harris's physical condition was substantially true, and therefore cannot give rise to liability for defamation. It notes that there is no dispute that Harris had a glass eye, and that Dr. Jafri's statement that Harris possibly had a stroke or head injury "is substantially true considering Harris's claims that she passed out after standing up." Mem. at 14. "An allegedly defamatory statement is not actionable if it is substantially true, even though it is not technically accurate in every detail." *Parker v. House O'Lite Corp.*, 756 N.E.2d 286, 296 (Ill. App. Ct. 2001) (citing *Cianci v. Pettibone Corp.*, 698 N.E.2d 674, 678 (1998)). To demonstrate substantial truth, a "defendant need only show the truth of the 'gist' or 'sting'" of the statement at issue. *Cianci*, 698 N.E.2d at 679. Importantly, "[t]he defense of substantial truth normally is a jury question," unless a court determines that no reasonable jury could find substantial truth has not been established. *Parker*, 756 N.E.2d at 296.

Here, when the Court draws every reasonable inference in Harris's favor, as it must do at this stage, it is persuaded that Dr. Jafri's statement that Harris has a glass eye is true. But, the Court cannot determine that Dr. Jafri's statement that Harris may have suffered a stroke or head injury was substantially true as a matter of law. The emergency room physician who first examined Harris after she passed out found no indication of head injury or stroke and discharged her accordingly. Def.'s LR 56.1(a)(3) Stmt., Ex. 19.[3] The emergency room physician did not observe the left pupil irregularity that was the basis for Dr. Jafri's prognosis of a possible stroke or head injury, and when

---

[3] This out-of-court statement and all those referenced in this paragraph would be admissible for their truth because they satisfy the hearsay exception for statements made for medical diagnosis or treatment. Each was made for and was reasonably pertinent to treating Harris, and described her medical history or present symptoms. *See* Fed. R. Evid. 803(4).

17

Dr. Jafri asked about the irregularity, the physician insisted that it was normal. *Id.* Harris also told Dr. Jafri that the condition of her left eye was unchanged. *Id.* A reasonable jury, therefore, could conclude that Dr. Jafri's assessment that Harris may have suffered a stroke or head injury was false.

What is more, the CTA ignores Dr. Jafri's purported statement that, in light of Harris's condition, she "did not need to be driving for [the] CTA." Pl.'s Dep. 142:19–20. The CTA limits its discussion of Dr. Jafri's statements to his assessment of Harris's physical condition, but her defamation claim is not so limited. Rather, her objection to Dr. Jafri's statements appears to stem from false insinuations about her ability to perform her job properly, as the Court noted in its initial decision denying the CTA's motion to dismiss the claim. *Harris v. Chi. Transit Auth.*, 2015 WL 5307721, at *7. Given that Harris returned to work following the incident, a reasonable jury could conclude that Dr. Jafri falsely asserted that Harris was unable to perform her job.

For similar reasons, the CTA's final defense to liability for defamation—qualified privilege—is unavailing. Qualified privilege protects certain statements "based on the policy of protecting honest communications of misinformation in certain favored circumstances in order to facilitate the availability of correct information." *Kuwik v. Starmark Star Mktg. & Admin., Inc.*, 619 N.E.2d 129, 133 (Ill. 1993) (citation omitted). When applicable, qualified privilege increases a plaintiff's burden by requiring a showing that the defendant intentionally made an allegedly defamatory statement while knowing it was false, or displayed a reckless disregard as to the statement's falsity. *Id.* To meet its burden of establishing qualified privilege, a defendant must demonstrate: "(1) good faith by the defendant in making the statement; (2) an interest or duty to uphold; (3) a statement limited in its scope to that purpose; (4) a proper occasion; and (5) publication in a proper manner and to proper parties only." *Id.* Even if a statement is subject to qualified privilege, the privilege may be abused, and therefore lost, if the plaintiff can show that the

defendant (1) knew of or recklessly disregarded the statement's falsity, (2) made the statement for an improper purpose, (3) made the statement to people "not reasonably believed to be necessary recipients," or (4) "did not reasonably believe that [the statement] was necessary to accomplish its privileged purpose." *Anderson v. Beach*, 897 N.E.2d 361, 367–68 (Ill. App. Ct. 2008). Whether a statement is subject to qualified privilege is a question of law, but "factual inquiries[ ] such as whether the defendant[ ] acted in good faith in making the statement, whether the scope of the statement was properly limited in its scope, and whether the statement was sent only to the proper parties," are properly left "solely with the jury." *Kuwik*, 619 N.E.2d at 133–34.

Here, the Court agrees that Dr. Jafri's statements involved interests that render the statements subject to qualified privilege. As the CTA points out, Dr. Jafri had an interest in ensuring consistency and accuracy in diagnosing Harris's condition, and the CTA had an interest in ensuring its bus drivers are medically fit to perform their duties, in order to ensure the safety of the public. Mem. at 14–15; *see Turner v. Fletcher*, 706 N.E.2d 514, 518 (Ill. App. Ct. 1999) (holding that a communication from a physician to another evaluator about whether a police officer was fit to return to duty was subject to qualified privilege). But, a reasonable jury could nevertheless conclude that Dr. Jafri's statements were not made in good faith, based on what the emergency room physician and Harris had told him about her condition. Relatedly, a reasonable jury could conclude that he abused his privilege by making the statements with reckless disregard to their falsity, or without a reasonable belief that he needed to make the statements to accurately diagnose Harris. On the present record, therefore, the Court cannot conclude that Dr. Jafri's statements were privileged as a matter of law.

For these reasons, the CTA's motion for summary judgment on Harris's defamation claim is denied.

19

## Conclusion

For the foregoing reasons, the CTA's motion for summary judgment [72] is granted in part and denied in part. The Court grants the motion with respect to Harris's claim of Title VII retaliation. In addition, the Court grants the motion with respect to Harris's FMLA interference claim relating to leave requests occurring on or after November 11, 2013. The motion for summary judgment is denied in all other respects. The Court also grants the CTA's motion to strike [96] Harris's submissions in response to summary judgment. A status hearing is set for 10/12/17 at 9:00 a.m.

**IT IS SO ORDERED.**                                    **ENTERED: 9/22/17**

*/s/ John Z. Lee*

_____
**JOHN Z. LEE**
**United States District Judge**